HOFFMAN EQUIPMENT, INC., Hoffman International, Inc., Hoffman Rigging and Crane Service, Inc., Far Hills, Inc., Reliance Insurance Company and Allstate Insurance Company, Plaintiffs,

v.

CLARK EQUIPMENT COMPANY, Defendant.

Civ. A. No. 89–4679.

United States District Court, D. New Jersey.

Oct. 16, 1990.

Wilentz, Goldman & Spitzer, Woodbridge, N.J., and Gordon C. Rhea, Christiansted, St. Croix, U.S. Virgin Islands, for plaintiffs Hoffman Equipment, Inc., Hoffman Intern., Inc., Hoffman Rigging and Crane Service, Inc. and Far Hills, Inc.

Joseph F. Falgiani, McCarter & English, Newark, N.J., and Richard F. Hunter, Hunter, Colianni, Cole & Turner, Christiansted, St. Croix, U.S. Virgin Islands, for defendant.

## OPINION

LECHNER, District Judge.

Hoffman Equipment, Inc. ("Hoffman")[1] brought this action by filing a complaint for indemnification (the "Complaint") against Clark Equipment Company ("Clark") with regard to money paid to one Michael Polius, an individual injured by a crane manufactured by Baldwin–Lima–Hamilton Corporation ("Baldwin"). Jurisdiction is based upon diversity and appears to be appropriate. *See* 28 U.S.C. § 1332. Presently before the court are the motion by Clark and the cross-motion by Hoffman for summary judgment.[2] For the reasons set forth below, the Clark motion for summary judgment is granted; the Hoffman cross-motion for summary judgment is denied.

### I. *Introduction*

This case is a painful example of manipulation and forum shopping by counsel as well as what appears to be conduct which is less than forthcoming in dealing with the Circuit. This case and, indeed, this decision are yet additional steps in the tortured history of a matter which commenced more than six years ago with the filing of a lawsuit by Michael Polius in the District of the Virgin Islands because of injuries suffered on 29 November 1983 when his left foot was caught in the winding drum of a crane and traumatically amputated. Including that first filing against Clark which ultimately resulted in a Circuit Court determination that Clark had no liability or responsibility for the injuries suffered by Mr. Polius, four separate lawsuits have been filed. Three of these actions were filed in the District of the Virgin Islands and this, the fourth, was filed in the District of New Jersey. Of these four filings, two have already found their way to the Circuit, one was settled and this one, regardless of the outcome, will also likely find its way to the Circuit. Interestingly, the parties in the litigation were not only amenable to the litigation in the District of the Virgin Islands but, in fact, Hoffman and Clark were named parties. As will be explained in this opinion, there is simply no basis for the forum shopping and splitting of this cause of action into four separate lawsuits in two districts.

### II. *Facts*

The crane which is the subject of this lawsuit, and indeed the three other lawsuits filed in District of the Virgin Islands, is a Model 900 T Lima 90–ton crane bearing the serial number 3552-7 (the "Crane"). The Crane was manufactured in April 1969 by Baldwin at its Lima Division Plant in Lima, Ohio. The Crane was sold to one of the Baldwin distributors, Hoffman Equipment, Inc. ("Hoffman Equipment"), in January 1970 and was shipped to Hoffman Equipment in Belleville, New Jersey on 28 January 1970. Thereafter, Hoffman Equipment sold the Crane to one of its related companies, Hoffman Rigging and Crane Service, Inc. ("Hoffman Rigging"), which was in the business of renting and selling cranes. Hoffman Rigging leased the Crane to a company known as Amerint Shipping for use in St. Thomas, U.S. Virgin Islands. After Amerint Shipping failed to make monthly rental payments, a principal of Hoffman travelled to St. Thomas and negotiated the sale of the Crane to the West Indies Company, Ltd., which in turn sold it to Canton–Michael, which in turn

---

1. The term "Hoffman" refers to the several New Jersey corporations which are plaintiffs in this action, including Hoffman Equipment Co., Hoffman Rigging & Crane Co., and Hoffman International.

2. In support of its motion for summary judgment, Clark submitted the following: Brief of Defendant, Clark Equipment Company, in Support of Motion for Summary Judgment ("Clark Brief") and Reply Brief of Clark in Support of Motion for Summary Judgment ("Clark Reply").

In support of its cross-motion for summary judgment, Hoffman submitted the following: Brief of Plaintiffs in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Plaintiffs' Cross-Motion for Summary Judgment ("Hoffman Brief").

The parties submitted two bound volumes of exhibits: Bound volume of twenty-six exhibits labelled A–Z ("Clark Exhibit __"); Bound volume of nine exhibits labelled 1–9 ("Hoffman Exhibit __").

Also submitted was a Stipulation to Add Parties, dated 4 May 1990 ("Stipulation").

sold it to General Engineering Corporation ("GEC"). Michael Polius was an employee of GEC on 29 November 1983 when he suffered the traumatic amputation because his foot "became enmeshed in some inadequately guarded gears of the [C]rane." Complaint at ¶ 7. Thereafter, suit was commenced against Clark for these injuries and this odyssey began.

### A. Corporate Backgrounds and Inter-relationships

#### Baldwin

At the time it initially manufactured and sold the Crane to Hoffman Equipment, Baldwin was a large corporation which functioned through seven divisions. All of the stock of Baldwin was owned by Armor and Company which in turn was owned by the Greyhound Corporation. Baldwin manufactured construction equipment, heavy machinery and industrial equipment. The construction equipment division of Baldwin ("CED")[3] consisted of two parts—one located in Lima, Ohio known as the Lima Division and one located in Aurora, Illinois known as the Austin–Western Division. The Lima Division produced a line of power shovels, lifting cranes, drag lines, front-end loaders, rock crushers, road packing equipment, asphalt plants and pavers for the construction industry. The Austin–Western Division produced road graders, compaction equipment, street sweepers and hydraulic cranes.

#### Hoffman

The plaintiffs in this matter, Hoffman Equipment, Hoffman International, Inc., Hoffman Rigging and Far Hills, Inc. are all related corporations incorporated under the laws of the State of New Jersey and have their principal places of business in the State of New Jersey. As mentioned, Hoffman Equipment was a distributor for Baldwin. However, Hoffman not only sold and distributed Baldwin cranes, it also maintained, serviced, inspected, sold replace-

ment parts and certified the cranes. Specifically, it maintained, serviced, inspected, sold replacement parts and certified the Crane in which Michael Polius was injured. *See* Clark Exhibit N.

#### Clark

Clark is incorporated under the State of Delaware and has its principal place of business in Michigan. Clark is a company with worldwide sales in 1971 of approximately $740,000,000. At the time at issue, Clark was a diversified company serving markets on a worldwide basis. It included automotive products, construction machinery, construction equipment, forestry equipment and a credit corporation. *See* Hoffman Exhibit 6. In 1971, Clark continued a long standing program of selective diversification through acquisition. Specifically, in April 1971, Clark acquired the CED of Baldwin.

#### Clark Acquisition of CED of Baldwin

In 1971, Greyhound Corporation decided to sell the Baldwin assets. In April 1971, Clark purchased the CED of Baldwin for more than $45,000,000. The effective date of the acquisition was 30 April 1971. This acquisition occurred some two years after the manufacture of the Crane, approximately one and one-half years after Baldwin sold the Crane to Hoffman Industrial and more than twelve years before Michael Polius was injured.

The Purchase Agreement between Clark and Baldwin provided Clark would receive all assets of Baldwin "required to operate the business" of the CED "in the manner in which [it was then] being operated." *See* Clark Exhibit L, Purchase Agreement, dated 30 April 1971 at 9, § 1.21.

The sale of the CED to Clark included two manufacturing facilities, together with inventory, accounts receivable, customer lists, good will, trade names, patents and trademarks of Baldwin. The liability assumed by Clark was limited. Clark assumed liability for the trade accounts, pay-

---

**3.** The six other divisions of Baldwin were The Electronics Division in Waltham, Massachusetts, The Industrial Equipment Division in Eddystone, Pennsylvania, The Standard Steelworks Division in Burnham, Pennsylvania, The Green Fuel Division in Beacon, New York, The Allen–Sherman–Hoff Company in Wynwood, Pennsylvania, and The Trans–International Corporation in West Germany.

roll, vacation pay and some taxes as well as selected contractual obligations.

The Purchase Agreement did not transfer service contracts maintained by Baldwin. Moreover, Clark expressly refused to assume any tort liabilities; Baldwin and Armor agreed to indemnify Clark for all claims arising from the operation of the CED prior to the transfer. No sale or exchange of stock occurred; no officer or director of Baldwin became an officer or director of Clark.

The Purchase Agreement did not mandate the dissolution of Baldwin. In 1972, Baldwin changed its name to "BLH, Inc." By 1972, Baldwin had sold the six remaining divisions and had become an inactive corporate shell. BLH was dissolved in 1976, approximately seven years after the manufacture of the Crane and approximately seven years before Michael Polius was injured.

At the time of the sale of CED of Clark, CED produced approximately 39.5 percent of the total revenues of Baldwin. There is nothing to suggest or from which to infer the sale of CED to Clark was anything other than in the normal course of business. There is nothing to suggest or from which to infer the sale was conducted for the purpose of Baldwin avoiding debts or liabilities or to defraud creditors. It appears the price paid for the sale of the CED was the result of negotiation between equal bargaining parties.

After the sale of the CED, Baldwin continued operations with its heavy machinery and industrial equipment divisions. The Purchase Agreement, as mentioned, did not obligate Baldwin to dissolve. In fact, Clark expected Baldwin "to remain in active operation as an ongoing and fiscally sound business enterprise." Clark Exhibit A, Affidavit of J.E. Toliver, Vice President and General Counsel of Clark, at 10.

Clark neither designed nor manufactured nor sold nor maintained nor serviced nor inspected nor certified the Crane. The Crane was designed, manufactured and sold by Baldwin and was discontinued by Baldwin prior to the purchase of the CED by Clark. After the purchase of the CED, Clark designed, manufactured and sold its own product line of cranes, including Models 7700, 714, 715 and 724. "These cranes were entirely the product of Clark ... and had not been designed or manufactured by Baldwin...." *Id.* at ¶ 16. The two manufacturing plants purchased by Clark suffered annual operating losses and were shut down in 1981.

### B. Litigation History

*Michael Polius Litigation*

*Polius v. Clark*

On 29 February 1984, Michael Polius sued Clark in the District Court for the District of the Virgin Islands, Division of St. Croix, Civil Number 1984/78. The suit was for injuries sustained by him on 29 November 1983 while employed by GEC which owned and was operating the Crane. After presentation of cross-motions for summary judgment, the district court granted partial summary judgment in favor of Michael Polius on the issue of the successor liability of Clark but also granted Clark's cross-motion for summary judgment and found no duty on its part to warn of any defect in the Crane. *Polius v. Clark Equipment Co.*, 608 F.Supp. 1541 (D.V.I.1985).

Thereafter, on petition for interlocutory appeal, the Circuit determined Clark had no liability to Polius with respect to any injuries, losses or damages proximately caused by the Crane and found the district court erred in granting the plaintiff's motion for partial summary judgment on the basis of a continuity of enterprise exception to the general rule of corporate successor liability. It found the district court did not err in granting Clark's motion for partial summary judgment on the basis of a failure to establish a duty to warn. The Circuit remanded the case with direction that the district court enter judgment in favor of Clark. *Polius v. Clark Equipment Co.*, 802 F.2d 75 (3d Cir.1986). A petition for rehearing *en banc* was denied on 23 October 1986.

*Polius v. Hoffman*

On 25 July 1985, during the pendency of the interlocutory appeal in *Polius v. Clark*, Michael Polius sued Hoffman in the District Court for the District of Virgin Islands, Division of St. Croix, Civil Number 179/85. The suit was for injuries suffered by him on 29 November 1983 while employed by GEC which owned and was operating the Crane. This was the same incident which formed the basis for the *Polius v. Clark* litigation. Hoffman did not implead Clark in this litigation. On 8 October 1987, Michael Polius and his wife settled with Hoffman and its insurers, Reliance Insurance Company and Allstate Insurance Company. *See* Clark Exhibit V, Settlement Agreement and Release (the "Settlement Agreement"). The Settlement Agreement indicates the insurance companies were the liability insurers for Hoffman "and, as such, would be obligated to pay any judgment obtained against [Hoffman], which is covered by [the] policy." *Id.* at 2, ¶ b. The matter was settled for $861,433.00. *See* Complaint, ¶ 11.

*Clark v. Hoffman*

On 29 December 1986, Clark filed a declaratory judgment action in the District of the Virgin Islands, Division of St. Croix, Civil Number 294/86 against Hoffman. This declaratory judgment action was filed almost one year before settlement was effected in *Polius v. Hoffman* and sought a judgment declaring Clark had no liability to Hoffman for the injuries suffered by Michael Polius.

On 17 December 1987, the district court entered summary judgment in favor of Clark ruling Clark was not liable to Hoffman for indemnification or contribution concerning the accident or injuries suffered by Michael Polius on 29 November 1983. In ruling on this motion, the district court relied on the Circuit opinion in *Polius v. Clark, supra*, 802 F.2d at 75. Hoffman appealed that decision.

After the parties submitted their briefs to the Circuit in connection with the appeal by Hoffman, Hoffman filed a motion to dismiss contending no formal demand for contribution or indemnification had been made against Clark and therefore no case or controversy existed. *See* Clark Exhibit T, Motion to Dismiss Appeal.

Hoffman contended in its motion that: "At the time of Clark's filing [of the declaratory judgment action], Hoffman had neither been adjudged liable to Polius nor settled with Polius, and Hoffman had demanded no contribution or indemnity from Clark." *Id.* at 2. Hoffman went on to state in its motion: "In this case, not only was there no ripe controversy at the time the declaratory judgment action was filed, there remains none to date, as Hoffman has made no demand on Clark for indemnity or contribution." *Id.* at 4. The motion to dismiss the appeal was dated 27 October 1988.

Significantly, on 12 February 1988, some eight months before the filing of the notice of motion to dismiss the appeal, counsel for Michael Polius agreed to substitute "as counsel for Hoffman with regard to the pending appeal [in *Clark v. Hoffman*] from the granting of summary judgment to Clark...." *See* Clark Exhibit S, Retainer Agreement at 1. Moreover, counsel for Hoffman in this action, who previously represented Michael Polius against Hoffman, stated:

> If successful in reversing such decision [the grant of summary judgment in favor of Clark in *Clark v. Hoffman*], *we will prosecute claims for indemnity and related theories on behalf of Hoffman's insurers.* Our representation will be on a strictly contingent fee basis in the amount of fifty percent of any recovery whether by settlement or judgment.

*Id.*[4] (emphasis added).

In its per curiam opinion vacating the district court granting of summary judg-

---

**4.** As mentioned, these are the same attorneys who represented Michael Polius in recovering more than $861,000 by way of settlement from Hoffman. It is assumed these attorneys received a fee and that that fee was based upon a

contingency of thirty-three and one-third percent of the $861,000. Accordingly, by the arrangement with Hoffman's insurers, Reliance Insurance Company and Allstate Insurance Company, signatories to the Settlement Agree-

ment and remanding to the court with instructions to dismiss the complaint in *Clark v. Hoffman,* the Circuit stated:

> In this case [*Clark v. Hoffman*], there appears to be no immediate controversy between the parties. The record does not reflect that Hoffman ever demanded payment from Clark Equipment. This is an "essential fact" which Clark must establish in order to seek declaratory relief.... *Indeed, there is no indication that Clark Equipment will ever be asked or compelled to reimburse Hoffman for payments made to [Michael] Polius [and his wife to effect settlement in Polius v. Hoffman].*

Clark Exhibit J, Per Curiam Opinion in *Clark v. Polius,* slip op. at 5 (emphasis added).

### Hoffman v. Clark

The Complaint in the instant matter was filed by Hoffman on 13 November 1989, almost two years after attorneys for Michael Polius were retained to prosecute claims for indemnity and related theories against Clark on behalf of Hoffman's insurers, a little more than one year after it filed its motion to dismiss the appeal in *Clark v. Hoffman,* and approximately six months after the judgment by the Third Circuit vacating the grant of summary judgment in *Clark v. Hoffman* and directing dismissal of that case. On 4 May 1990, Reliance Insurance Company and Allstate Insurance Company, the carriers for Hoffman which actually paid the settlement to Michael Polius and the real parties in interest, joined this suit as plaintiffs. *See* Stipulation to Add Parties, filed 4 May 1990. Indeed, it appears it was the intent of these carriers and their attorneys from at least 12 February 1988, the date of the retainer agreement, to prosecute claims for indemnity on behalf of Hoffman's insurers. *See* Clark Exhibit S, Retainer Agreement at 1.

Clark filed its Answer in this case on 22 January 1990 and raised sixteen affirmative defenses. In addition to pointing out the Circuit opinion in *Polius v. Clark,* 802

F.2d at 84 for the proposition that Clark is not a successor in interest to Baldwin with respect to the Crane and the incident involving Michael Polius, *see* Third Amended Defense, Clark raised several affirmative defenses which go to the subject matter of and facts surrounding the accident concerning Michael Polius. *See* the Fourth through Ninth Affirmative Defenses asserted on behalf of Clark. Clark also raised a statute of limitations defense. *See* Fourteenth Affirmative Defense. In addition, Clark, in its Twelfth Affirmative Defense, demands this matter be transferred to the District of Virgin Islands, Division of St. Croix, pursuant to 28 U.S.C. § 1404(a) under the doctrine of forum non conveniens.

It appears the Fourth through Ninth Affirmative Defenses center on the activities surrounding the accident of Michael Polius and the maintenance, servicing, repairing, supplying of parts, inspecting or certifying of the Crane as well as the asserted negligent conduct of Michael Polius.

### III. Discussion

#### A. Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). The district court's task is to determine whether disputed issues of fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Su-

---

ment with Michael Polius, whereby the attorneys have negotiated a fifty percent contingency, if the attorneys are successful in this action,

they may recover a total fee of eighty-three and one-third percent of the $861,000, all of which arose out of the injury to Michael Polius.

preme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. ... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted).

The Supreme Court elaborated on the standard in *Anderson v. Liberty Lobby, Inc.:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511. (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted). Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e).

### B. Choice of Law

 In diversity actions, federal courts determine the substantive law to be applied by looking to the choice of law rules of the forum state. *Van Dusen v. Barrack,* 376 U.S. 612, 645–46, 84 S.Ct. 805, 823–24, 11 L.Ed.2d 945 (1964); *Klaxon Co. v. Stentor Electronic Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Shields v. Consolidated Rail Corp.,* 810 F.2d 397, 399 (3d Cir.1987). New Jersey has adopted a governmental interest test in resolving choice of law issues. *Veazey v. Doremus,* 103 N.J. 244, 247, 510 A.2d 1187 (1986); *Heavner v. Uniroyal, Inc.,* 63 N.J. 130, 141, 305 A.2d 412 (1973); *Mellk v. Sarahson,* 49 N.J. 226, 230–31, 229 A.2d 625 (1967); *Pine v. Eli Lilly & Co.,* 201 N.J.Super. 186, 191, 492 A.2d 1079 (App.Div.1985).

 The court must consider, first, the governmental policies as reflected by the laws of the jurisdictions possibly involved and, second, the factual connections among the parties and the related jurisdictions. *Petrella v. Kashlan,* 826 F.2d 1340, 1343 (3d Cir.1987); *Pine,* 201 N.J.Super. at 191, 492 A.2d 1079. A state is deemed "interested" only where application of its law to the facts of the case will further the state's policy. *Petrella,* 826 F.2d at 1343; *Mellk,* 49 N.J. at 229, 229 A.2d 625. "This analysis does not count up the factual contacts with the respective states ... and make a quantitative determination of which state law should apply. Instead, 'the qualitative nature of contacts is considered so that only contacts which are likely to promote valid state policies are considered relevant.'" *Pine,* 201 N.J.Super. at 192, 492 A.2d 1079 (quoting *Henry v. Richardson–Merrell, Inc.,* 508 F.2d 28, 32 (3d Cir.1975)).

### C. Choice of Law Analysis

In *Veazey,* the Supreme Court of New Jersey considered a choice of law question with respect to interspousal immunity. The plaintiff, Mr. Veazey, a passenger in a car driven by his wife, was injured when the Veazey car collided with a car owned and operated by defendant, a New Jersey resident. The accident occurred in New Jersey. The Veazeys were on their way home to Florida where they had lived for approximately three years. Mr. Veazey filed a personal injury suit in New Jersey against both his wife and Mr. Doremus. The choice of law question revolved around the application of the doctrine of interspousal immunity. At the time Florida followed the doctrine. New Jersey had previously abandoned the doctrine in personal injury actions.

The court examined the governmental interests of both states in its analysis of choice of law. The court examined the governmental policies underlying the law of each state and how these policies were affected by each state's contacts to the litigation and to the parties. The court noted that "if a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply." *Id.* 103 N.J. at 248, 510 A.2d 1187 (citations omitted).

The court looked to the policy underlying Florida's interspousal immunity law. The court found that underlying the law is the desire of the state to prevent marital discord and fraudulent lawsuits which would result without the interspousal immunity doctrine. The court noted that New Jersey, on the other hand, had concluded that the marital relationship would not be disturbed by permitting suits against one's spouse in personal injury actions. The underlying theory in the court's analysis of the doctrine was that most motor vehicle owners would be covered by liability insurance thus the insurance carrier would become the real party in interest rather than the spouse. As such, it was concluded that by *not* permitting such suits, marital discord would result. The court further reasoned that any collusive or fraudulent suits which might result in the absence of an interspousal immunity statute could be adequately passed by the courts.

The New Jersey Supreme Court next analyzed the contacts each state had with the parties and the litigation. The court noted that while New Jersey as the situs of the accident has an interest in maintaining the safety of its highways, this interest is not related to the immunity of a party from suit because of a spousal relationship. The court reasoned that: "Spouses domiciled in states that recognize interspousal immunity are no less careful when they drive through a state that has abolished the immunity." *Id.* at 249–50, 510 A.2d 1187 (citations omitted). The *Veazey* court went on to state that an application of Florida's interspousal immunity law would not jeopardize New Jersey's strong interest in regulating the operation of motor vehicles on its highways.

The *Veazey* court concluded that New Jersey's abolition of the doctrine of interspousal immunity should affect those domiciled in New Jersey, not Florida. New Jersey's interest in spouses from other states is not nearly as strong as that of the states of the spouses. Florida, as the domicile of the spouses in *Veazey*, had the dominant interest in preserving the spouses marital relationship and in resolving the issue of Mrs. Veazey's liability to her husband. *Id.* at 251, 510 A.2d 1187.

*Henry v. Richardson–Merrell, Inc.*, 508 F.2d 28 (3d Cir.1975) concerned a plaintiff seeking damages for personal injuries suffered as a result of his mother's ingestion of thalidomide during pregnancy. The plaintiffs were residents and citizens of Quebec, Canada and the defendant, Richardson–Merrell, was a Delaware corporation with its principal offices located in New York. It did transact business in New Jersey. The controversy before the Circuit was the application of the appropriate statute of limitations. If the Quebec statute was applied, the case would be at an end.

The *Henry* court noted that New Jersey applies the governmental interest approach to choice of law questions. *Id.* at 32. It recognized: "A state is deemed interested only where application of its law to the facts in issue will foster that state's policy. ... [T]he qualitative nature of contacts is considered so that only contacts which are likely to promote valid state policies are considered relevant." *Id.* In reviewing the law of this state, the Circuit cited to the decision in *Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 305 A.2d 412 (1973).

*Heavner* concerned a North Carolina couple who sued Uniroyal, a tire manufacturer incorporated in New Jersey, for injuries caused by the blow-out of a defective tire. Apparently, the plaintiff purchased a truck equipped with the defective tire in North Carolina the accident occurred in North Carolina and plaintiffs at all times were domiciled in North Carolina. Uniroyal transacted business in each of the fifty

states. With reference to the *Heavner* decision, the Circuit stated: "The court stated that mere incorporation in New Jersey was a contact insufficient to warrant the application of New Jersey substantive law." *Henry, supra,* 508 F.2d at 33.

In *Allen v. Volkswagen of America, Inc.,* 555 F.2d 361 (3d Cir.1977), California residents brought an action against a manufacturer and importer of an automobile based upon injuries suffered while operating the automobile. The cause of action arose in California. The *Allen* court recognized that *Henry* had interpreted *Heavner* as adopting the governmental interest approach to resolve conflicts of law question. *Allen, supra,* 555 F.2d at 362.

■ The governmental interest approach is comprised of a two step analysis: "The court determines first the governmental policies evidenced by the laws of each related jurisdiction and second the factual contacts between the parties and each related jurisdiction." *Henry, supra,* 508 F.2d at 32. According to the *Henry* decision, the *Heavner* court did not perform the first step—the policy examination.[5] The *Henry* court interpreted *Heavner* as establishing the New Jersey method of performing the second step in the governmental analysis. To do this, it is required there be a balancing of all five of the factors enumerated in *Heavner.* These factors are: "(1) where the cause of action arose; (2) amenability to suit in other states; (3) the substantial interest, if any, of New Jersey in the suit; (4) which state's substantive law will apply; and (5) whether the other state's limitation statute has run." *Allen, supra,* 555 F.2d at 362–63.

In reviewing the facts concerning the *Allen* case, the Circuit noted the plaintiffs conceded at argument that all of the *Heavner* factors except New Jersey's substantial interest weighed against them. They were unable to suggest any substantial interest New Jersey might have in the case except for the fact that one of the defendants in *Allen* was incorporated in and had its principal place of business in New Jersey. The *Allen* court noted, however, that: "Very little of the 'business' in this case, though, was done in New Jersey. Volkswagen of America's regional office in California ordered from Germany, received, and distributed the automobile in question." *Id.,* 363 n. 6.

The *Allen* court observed that California had significantly greater contacts with the defendant which did business on a nationwide basis. It explicitly stated: "A defendant's incorporation and presence in New Jersey cannot be said, without more, to outweigh California's substantial involvement with the parties and accident in question." *Id.,* 555 F.2d at 364.

■ In the present litigation, a review of the five *Heavner* factors establishes the Virgin Islands has significantly greater contacts and leads to the conclusion New Jersey courts would borrow the law of the Virgin Islands with regard to this matter. Specifically, the cause of action arose in the Virgin Islands. The accident occurred on 29 November 1983 while Michael Polius was at his job in the Virgin Islands. Clearly, each of Clark and Hoffman were amenable to suit in the Virgin Islands.

New Jersey does not have a substantial interest in this suit. Although Hoffman and its related companies are incorporated in and have their principal places of business in the State of New Jersey, none of

---

**5.** As explained in *Henry:*

> The primary purpose of a torts recovery is to compensate plaintiffs for their injury. Since the Heavners were domiciliaries of North Carolina, New Jersey had no interest in protecting their compensation rights. An alternate purpose of torts suits is to exact compensation from the tortfeasor in order to deter future misconduct. Where the tortious activity took place wholly outside of New Jersey as in *Heavner,* however, that policy could not be fostered.

508 F.2d at 33 (footnote omitted).

> Here, the so-called tort activity took place outside of New Jersey. New Jersey has no interest in protecting the rights of Michael Polius or the insurance companies for Hoffman. Nor does New Jersey have an interest in deterring conduct in the Virgin Islands. In short, New Jersey's policies cannot be fostered when the tortious activity took place outside of this state. *Id.*

the conduct which implicated Hoffman and caused Hoffman to settle concerns New Jersey. One of its principals travelled to the Virgin Islands to effectuate the sale of the Crane and Hoffman serviced, maintained, repaired, inspected and certified the Crane in the Virgin Islands.

As noted by the New Jersey Supreme Court in *Heavner:*

> Plaintiffs have shopped not only for a forum where their suit might not be barred by the statute of limitations, but also where the substantive law would seemingly be more favorable than that of North Carolina. The latter is borne out by the complaint's demand for judgment seeking damages "in accordance with the laws of the State of New Jersey." We gather that it is quite doubtful whether North Carolina law, at the time of the accident, recognized strict liability in tort to the extent New Jersey does.... We may add that we do not believe that New Jersey has any sufficient interest in this action to call for the application of its substantive law in preference to that of North Carolina under the governmental interest choice-of-law principles.... Our only possible interest is that Uniroyal, a national company, is incorporated here and that is not enough.... All other interests are North Carolina's. Quite apart from choice-of-law considerations, it seems obvious that trial of the case would be much more convenient in North Carolina than in New Jersey.

*Heavner,* 63 N.J. at 134–35 n. 3, 305 A.2d 412. This quotation is directly applicable to this case. In point of fact, with the substitution of the Virgin Islands for North Carolina, the quotation describes the conduct of the plaintiffs in this matter.

It is obvious the filing of this lawsuit in New Jersey is forum shopping not only to avoid a statute of limitations problem but also to seek out what appears to be more favorable substantive law. The only possible interest New Jersey has in this case is that Hoffman is incorporated and has its principal place of business in this state. All other contacts belong to the Virgin Islands. In addition, it would be obviously more convenient to have tried this case in the District of the Virgin Islands.

Hoffman, moreover, had nothing to do with either negotiating or paying the settlement money to Michael Polius. Negotiation and payment of the settlement was undertaken entirely by Hoffman's insurance carriers, Reliance Insurance Company and Allstate Insurance Company. *See* Clark Exhibit W at 13, 15; Exhibit U. Neither of these companies is a New Jersey corporation. Neither Hoffman nor any of its subsidiaries were consulted with regard to permission to settle or the amount of the settlement. Hoffman has no interest in recovering the amount paid in settlement; interest in recovering this amount is with the insurance carriers. As such, New Jersey does not have a substantial interest or indeed any significant interest in this matter. The substantive law of the Virgin Islands as interpreted by the Third Circuit in *Polius v. Clark, supra,* 802 F.2d at 75, controls.

Because it is the situs of the accident, the Virgin Islands has an interest in maintaining construction safety and deterring negligent construction operation and negligent construction equipment design maintenance, inspection and certification. The interest of this state in the ability of injured plaintiffs to recover for such injuries "pales by comparison to the interest of [the Virgin Islands]." *Veazey,* 103 N.J. at 251, 510 A.2d 1187.

Presently the issue concerns a nominal plaintiff, Hoffman, which instituted a lawsuit for the real parties in interest—its insurance carriers, Reliance Insurance Company and Allstate Insurance Company. Because "mere incorporation in New Jersey was a contact insufficient to warrant the application of New Jersey substantive law [in *Heavner* ]," *Henry,* 508 F.2d at 33, there is even less force in the agreements advanced by plaintiffs in this action.

There are significant problems and considerations with a nominal plaintiff running interference for two out of state insurance companies in this litigation and contending New Jersey rather than Virgin Islands law should apply here. As explained in *Henry:*

In *Pfau* [*v. Trent Aluminum Co.*, 55 N.J. 511, 263 A.2d 129 (1970)] and *Mellk*, the New Jersey courts conceded without hesitation that the state where the auto accident occurred had a paramount interest in applying its "rules of the road." To judge conduct occurring in another state by New Jersey's highway rules would violate fundamental principles of fairness and comity. By analogy, New Jersey would not presume to tell a drug seller that its activity in Canada should be judged by the rules of New Jersey or for that matter by the United States Food and Drug Law. With respect to those portions of plaintiff's complaint alleging conduct occurring entirely within Canada, therefore, New Jersey would refuse to apply its substantive law. Canada clearly had the paramount interest in determining what testing and supportive data it would require before approving drugs for sale in Canada to Canadian citizens. Sound principles of comity direct that any misrepresentation to the Canadian drug authorities, or any inadequacy of labels be judged by that nation's laws.

*Henry*, 508 F.2d at 38–39.

The Virgin Islands clearly has the paramount interest in determining what type and extent of liability those individuals and companies engaged in construction within its territory will have for accidents and injuries at a job site. As in *Henry*, no less in this case, New Jersey would refuse to apply its substantive law. Comity requires the conduct of Clark be judged by the law of the Virgin Islands. *Henry*, 508 F.2d at 39.

As did the court in *Henry* and *Heavner* this court

> need go no further now than to say that when the cause of action arises in another state, the parties are all present in and amenable to the jurisdiction of that state, New Jersey has no substantial interest in the matter, the substantive law of the foreign state is to be applied....

*Henry*, 508 F.2d at 39.

*Conclusion*

Because the law of the Virgin Islands applies and "Hoffman concedes that under the Virgin Islands' corporate successor rule, Clark is not liable ...," Hoffman Brief at 5–6, this matter is dismissed with prejudice.